JS 44
(Rev. 12/96)

# CIVIL COVER SHEET

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS

Syeda Rizvi

**DEFENDANTS**

Albany Medical Center
Albany Medical College
Albany Medical Center Hospital

**(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF  Alleghany, Cty
(EXCEPT IN U.S. PLAINTIFF CASES)   PA

15908

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT  Albany, NY
(IN U.S. PLAINTIFF CASES ONLY)

NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)

Law Office of Bob Cohen
434 McClellan Road
Nassau, NY 12123

ATTORNEYS (IF KNOWN)

99-CV-0246
TJM  DRH

## II. BASIS OF JURISDICTION (PLACE AN "X" IN ONE BOX ONLY)

- ☐ 1 U.S. Government Plaintiff
- ☐ 2 U.S. Government Defendant
- ☒ 3 Federal Question (U.S. Government Not a Party)
- ☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN "X" IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT)
(For Diversity Cases Only)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. ORIGIN (PLACE AN "X" IN ONE BOX ONLY)

- ☐ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from another district (specify)
- ☐ 6 Multidistrict Litigation
- ☐ 7 Appeal to District Judge from Magistrate Judgment

## V. NATURE OF SUIT (PLACE AN "X" IN ONE BOX ONLY)

### CONTRACT
- ☐ 110 Insurance
- ☐ 120 Marine
- ☐ 130 Miller Act
- ☐ 140 Negotiable Instrument
- ☐ 150 Recovery of Overpayment & Enforcement of Judgment
- ☐ 151 Medicare Act
- ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans)
- ☐ 153 Recovery of Overpayment of Veteran's Benefits
- ☐ 160 Stockholders' Suits
- ☐ 190 Other Contract
- ☐ 195 Contract Product Liability

### REAL PROPERTY
- ☐ 210 Land Condemnation
- ☐ 220 Foreclosure
- ☐ 230 Rent Lease & Ejectment
- ☐ 240 Torts to Land
- ☐ 245 Tort Product Liability
- ☐ 290 All Other Real Property

### TORTS
**PERSONAL INJURY**
- ☐ 310 Airplane
- ☐ 315 Airplane Product Liability
- ☐ 320 Assault, Libel & Slander
- ☐ 330 Federal Employers' Liability
- ☐ 340 Marine
- ☐ 345 Marine Product Liability
- ☐ 350 Motor Vehicle
- ☐ 355 Motor Vehicle Product Liability
- ☐ 360 Other Personal Injury

**PERSONAL INJURY**
- ☐ 362 Personal Injury — Med Malpractice
- ☐ 365 Personal Injury — Product Liability
- ☐ 368 Asbestos Personal Injury Product Liability

**PERSONAL PROPERTY**
- ☐ 370 Other Fraud
- ☐ 371 Truth in Lending
- ☐ 380 Other Personal Property Damage
- ☐ 385 Property Damage Product Liability

### CIVIL RIGHTS
- ☐ 441 Voting
- ☒ 442 Employment
- ☐ 443 Housing/ Accommodations
- ☐ 444 Welfare
- ☐ 440 Other Civil Rights

### PRISONER PETITIONS
- ☐ 510 Motions to Vacate Sentence
**HABEAS CORPUS:**
- ☐ 530 General
- ☐ 535 Death Penalty
- ☐ 540 Mandamus & Other
- ☐ 550 Civil Rights
- ☐ 555 Prison Condition

### FORFEITURE/PENALTY
- ☐ 610 Agriculture
- ☐ 620 Other Food & Drug
- ☐ 625 Drug Related Seizure of Property 21 USC 881
- ☐ 630 Liquor Laws
- ☐ 640 R.R. & Truck
- ☐ 650 Airline Regs
- ☐ 660 Occupational Safety/Health
- ☐ 690 Other

### LABOR
- ☐ 710 Fair Labor Standards Act
- ☐ 720 Labor/Mgmt. Relations
- ☐ 730 Labor/Mgmt. Reporting & Disclosure Act
- ☐ 740 Railway Labor Act
- ☐ 790 Other Labor Litigation
- ☐ 791 Empl. Ret. Inc. Security Act

### BANKRUPTCY
- ☐ 422 Appeal 28 USC 158
- ☐ 423 Withdrawal 28 USC 157

### PROPERTY RIGHTS
- ☐ 820 Copyrights
- ☐ 830 Patent
- ☐ 840 Trademark

### SOCIAL SECURITY
- ☐ 861 HIA (1395ff)
- ☐ 862 Black Lung (923)
- ☐ 863 DIWC/DIWW (405(g))
- ☐ 864 SSID Title XVI
- ☐ 865 RSI (405(g))

### FEDERAL TAX SUITS
- ☐ 870 Taxes (U.S. Plaintiff or Defendant)
- ☐ 871 IRS — Third Party 26 USC 7609

### OTHER STATUTES
- ☐ 400 State Reapportionment
- ☐ 410 Antitrust
- ☐ 430 Banks and Banking
- ☐ 450 Commerce/ICC Rates/etc.
- ☐ 460 Deportation
- ☐ 470 Racketeer Influenced and Corrupt Organizations
- ☐ 810 Selective Service
- ☐ 850 Securities/Commodities/ Exchange
- ☐ 875 Customer Challenge 12 USC 3410
- ☐ 891 Agricultural Acts
- ☐ 892 Economic Stabilization Act
- ☐ 893 Environmental Matters
- ☐ 894 Energy Allocation Act
- ☐ 895 Freedom of Information Act
- ☐ 900 Appeal of Fee Determination Under Equal Access to Justice
- ☐ 950 Constitutionality of State Statutes
- ☐ 890 Other Statutory Actions

## VI. CAUSE OF ACTION (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE BRIEF STATEMENT OF CAUSE DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY.)

See Attached Sheet

## VII. REQUESTED IN COMPLAINT:

CHECK IF THIS IS A **CLASS ACTION**
☐ UNDER F.R.C.P. 23

**DEMAND $**
$300,000

CHECK YES only if demanded in complaint:
**JURY DEMAND:**   ☒ YES   ☐ NO

## VIII. RELATED CASE(S) IF ANY (See instructions):

JUDGE _____   DOCKET NUMBER _____

DATE
February 19, 1999

SIGNATURE OF ATTORNEY OF RECORD
*Bob Cohen*

FOR OFFICE USE ONLY

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____

Attachment to Civil Cover Sheet
Rizvi v. Albany Medical Center et al.
Filed: February 19, 1999

IV. Cause of Action: This action is brought under the Family and Medical Leave Act,
29 U.S.C. §§ 2601 et seq. ("FMLA"), Title VII of the Civil Rights Act of 1964, 42
U.S.C. §§ 2000e et seq. ("Title VII"), the Pregnancy Discrimination Act, 42 U.S.C. §
2000e(k) ("PDA"), and the Americans With Disabilities Act of 1990, 42 U.S.C. §§
12101 et seq. ("ADA") by a medical resident against a medical center which refused to
renew her residency for a second and third year after she attempted to return to her
position after going on leave to take care of her newborn daughter.

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------------x

SYEDA RIZVI,

                      Plaintiff,

      -against-

ALBANY MEDICAL CENTER, ALBANY MEDICAL
COLLEGE, ALBANY MEDICAL CENTER
HOSPITAL, INC.

               Defendants.

------------------------------------------------------------------------x

Civil Action No.

# 99-CV-0246

COMPLAINT
JURY TRIAL DEMANDED

**TJM DRH**

*#1*
*Summons Iss'd*
*(WL)*

*$150 Pd*

## PRELIMINARY STATEMENT

1.     This action is brought under the Family and Medical Leave Act, 29 U.S.C. §§ 2601 et
seq. ("FMLA"), Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e et seq. ("Title
VII"), the Pregnancy Discrimination Act, 42 U.S.C. § 2000e(k) ("PDA"), the Americans With
Disabilities Act of 1990, 42 U.S.C. §§ 12101 et seq. ("ADA"), and the New York State Human
Rights Law, N.Y.Exec.Law §§ 290 et seq. ("NYSHRL") by a medical resident against a medical
center which refused to renew her residency for a second and third year after she attempted to
return to her position after going on leave to take care of her newborn daughter. The defendants
took this action despite the fact that plaintiff performed her duties in a satisfactory manner, as
evidenced by defendants' own evaluations and a positive recommendation letter sent to other
residency programs.

2.     The failure to renew plaintiff violated FMLA's requirement that employees taking family
leave be restored to the same or an equivalent position held as when the employee's leave
commenced, and constituted discrimination based on gender, pregnancy, and disability under the
above-cited civil rights statutes. The plaintiff also alleges that such conduct breached her

contract with the defendants under New York common law.

3.      Finally, plaintiff alleges that she was promised prior to beginning her residency that her
employment was for a three-year term.  Plaintiff alleges that she reasonably relied on such
promises, and that such reliance was to her detriment in that had plaintiff known that her term of
employment was one year, she would have applied to second and third-year residency programs
at other schools.  Plaintiff also alleges that she reasonably relied on the defendants' promises that
she could return to her residency after taking family leave; such reliance was to plaintiff's
detriment, in that had plaintiff been aware that she would not be reinstated after her family leave,
she would not have taken such leave.  In accordance with the principles of promissory estoppel
under New York common law, defendants are estopped to deny such promises because of
plaintiff's reliance on them.

4.      As a result of defendants' illegal conduct, plaintiff has suffered substantial losses,
including the loss of past and future earnings and other employment benefits and damage to her
good name and reputation.  Plaintiff also has experienced severe and lasting embarrassment,
humiliation and anguish as a result of the defendants' conduct.  The plaintiff therefore seeks in
this action, among other things, reinstatement to her position, economic and non-economic
damages, and attorneys' fees and the costs of this action.   A jury trial is requested.

## JURISDICTION AND VENUE

5.      This Court has jurisdiction over the federal claims under 28 U.S.C. §§ 1331 and 1343, 29
U.S.C. § 2617, 42 U.S.C. § 2000e-5, and 42 U.S.C. § 12117 and supplemental jurisdiction over
the state claims under 28 U.S.C. § 1367.

6.      Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(1) and/or (b)(2), in that,
upon information and belief, (1) the defendants  reside in this district and in the State of New

York, and/or (2) a substantial part of the events or omissions giving rise to the claim occurred in the Northern District of New York.

## THE PARTIES

7.     Plaintiff Syeda Risvi is a female citizen of the United States and a resident of the City of Pittsburgh in the State of Pennsylvania. She was employed as a medical resident by defendant Albany Medical Center Hospital, Inc. ("AMCH") from December 11, 1995 to February 2, 1997.

8.     Defendant Albany Medical Center ("AMC") is an academic medical center located in the City and County of Albany, State of New York. AMC includes defendant Albany Medical College (the "College"), which trains medical students, residents and fellows, and defendant AMCH, a teaching hospital where medical residents are placed for their training. AMC, the College and AMCH are referred to collectively herein as the defendants.

## PROCEDURAL REQUIREMENTS

9.     Plaintiff filed a charge of employment discrimination with the Equal Employment Opportunity Commission ("EEOC") against defendant Albany Medical College on or about June 5, 1998. The plaintiff received a "Notice of Right to Sue" concerning the charge from the New York District Office of the EEOC dated November 23, 1998 entitling her to initiate a civil action with respect to the charge within 90 days of the receipt of said notice.

## BACKGROUND

10.     Upon information and belief, two distinct categories of residents are employed by the defendants. "Preliminary residents" are understood to be engaged in a one-year course of study "preliminary" to entry into some other training program such as radiology for further specialty training. On the other hand, "categorical residents" are engaged in a training program of three or

3

more years which results in eligibility for board certification in a chosen specialty. Both types of residencies require a Doctor of Medicine ("M.D.") degree as a condition of admission.

11.     Upon information and belief, by policy and custom, preliminary and categorical residents undertake distinctly different courses of study during the first year of their residency with the defendants, both in terms of the rotations they are assigned to, and other aspects of their training.

12.     Both preliminary and categorical residents serve as salaried employees of the defendants. Residents have a benefit package which includes, among other things, health insurance and participation in the retirement plan.

13.     Upon information and belief, plaintiff's employment is governed by a "House Staff Appointment Agreement," entered into on December 8, 1995, AMCH by-laws, and various other written and oral terms and conditions of employment.

FACTUAL ALLEGATIONS

14.     Plaintiff received the Doctor of Medicine ("M.D.") degree from the St. George's University School of Medicine in Grenada, West Indies on June 23, 1995.

15.     By a letter dated March 14, 1995, Dr. John Rosenberger ("Dr. Rosenberger"), then co-program director of AMC's Housestaff in Internal Medicine, offered plaintiff a "PGY-1 Preliminary Residency" at AMCH beginning on July 1, 1995 (the "March 1995 acceptance letter"), which plaintiff accepted the next day. The March 1995 acceptance letter provided that an "official contract" would be forwarded in April.

16.     Upon information and belief, a condition of starting a residency position at AMCH for foreign-trained physicians such as plaintiff is meeting the certification requirements of the Educational Commission for Foreign Medical Graduates (the "ECFMG"), including the passage

4

of certain tests.

17.     Prior to the scheduled beginning of her residency, plaintiff notified AMC Administrative Director Rodi M. Worgan ("Worgan" or "Administrative Director Worgan") that her ECFMG test results would not arrive in a timely fashion.  Worgan then informed plaintiff that she could not begin her preliminary residency on July 1, 1995, as had been promised in the March 1995 acceptance letter.

18.     Subsequently,  Administrative Director Worgan informed plaintiff that an opening for a categorical resident had arisen at AMCH because a resident from the Buffalo, New York area had decided not to continue in the program.  Worgan offered plaintiff the position, which plaintiff orally accepted.  Plaintiff relied on Worgan's promise that her position was categorical.

19.     On  December 8, 1995, plaintiff signed a "House Staff Appointment Agreement" ("House Staff Agreement") hiring her for a categorical resident position in AMCH's Division of Internal Medicine.  The House Staff Agreement provided that the term of plaintiff's appointment was December 11, 1995 through December 10, 1996.

20.     Upon information and belief, although house staff agreements for categorical residents provide for a one-year term, defendants have a custom and policy of renewing categorical residents upon successful completion of the requirements of the program for an additional  period of one or more years sufficient to complete the certification requirements of their chosen specialty.

21.     During the term of her residency, both Program Director John Rosenberger, M.D. and Chief Resident Frank Fera, M.D. informed the plaintiff that she was a categorical resident.  Moreover, in notes of meetings held on or about November 15, 1996, and December 18, 1996, Dr. Rosenberger referred to plaintiff as a categorical resident.

5

22.     Upon information and belief, plaintiff was assigned to the rotations customarily assigned to a first-year categorical resident in defendants' Internal Medicine Residency Program (the "Internal Medicine Program"), rather than the rotations customarily assigned to a preliminary resident.

23.     In March of 1996, plaintiff informed Dr. William Caramore ("Dr. Caramore"), then co-director of the Internal Medicine Residency Program, that she was pregnant. Upon information and belief, Dr. Caramore informed other AMC personnel of the pregnancy, including Dr. Rosenberger, and Dr. Roheet Gulathy ("Dr. Gulathy"), then the Chief Resident of the Internal Medicine Program.

24.     Supervisory personnel employed by defendants treated plaintiff differently in regard to evaluations, assignments, and other terms and conditions of her employment once they learned that plaintiff was pregnant, as illustrated in paragraphs 25-29 below.

25.     In June of 1996, Dr. Rosenberger and Dr. Gulathy had two meetings with plaintiff ostensibly to discuss her allegedly inadequate performance (the "June 1996 meetings"). During those meetings, both individuals asked plaintiff numerous questions concerning her ability to function competently as a resident once her baby was born. Among other things, one or both doctors asked the plaintiff: (a) whether she would utilize a "breast pump" to express milk during working hours for the baby's later use; (b) who was going to take care of the baby while plaintiff was on rotation, given that plaintiff's husband was then a medical resident outside of the region and would not reside with her once their child was born; and (c) whether plaintiff would hire a nanny to take care of the child.

26.     During the June 1996 meetings, Dr. Gulathy provided plaintiff with the telephone number of a social worker who he stated could assist her with such issues as obtaining adequate child care and other maternity issues, such as breastfeeding.

6

27.    During the June 1996 meetings, Dr. Gulathy informed plaintiff that he knew how difficult it was to work when one was the parent of a newborn baby. Dr. Gulathy stated that his wife had had to postpone her residency to take care of their newborn child, and that plaintiff's life would be particularly difficult, given that her husband would not reside with her.

28.    Upon information and belief, residents employed by the defendants who are expectant fathers or who have recently became fathers are not questioned concerning their planned child care arrangements, breastfeeding plans, and whether they are able to handle the requirements of their residency program.

29.    During the June 1996 meetings, plaintiff asked Dr. Rosenberger why she had not thus far been assigned to an outpatient clinic, which was a regular part of the course of study for categorical residents in their first year. Dr. Rosenberger replied that plaintiff "shouldn't worry" about obtaining clinical assignments at this time, since she was "having a baby" and had "a lot of things on her hands."

30.    Plaintiff's daughter, Amber Shergill, was born on August 25, 1996. Plaintiff took maternity leave from August 24, 1996 to October 8, 1996, using a combination of four weeks vacation and two weeks disability leave.

31.    Plaintiff's first rotation after returning from maternity leave (October 9, 1996 to October 31, 1996) was at the Veteran's Administration Hospital (the "VA") in Albany (the "October VA rotation"). During that rotation, Dr. Emily Etzkorn ("Dr. Etzkorn"), a resident who supervised the defendant, made repeated references to plaintiff's alleged inability to perform her responsibilities in light of the fact that she had just given birth to a child. For example, Dr. Etzkorn said that she "couldn't believe" how plaintiff could be a medical resident while raising an infant, and expressed her opinion that AMC should give plaintiff additional family leave time. For her October VA rotation, plaintiff received grades ranging from 4 to 6 (i.e., "satisfactory") on

7

a 9 point scale, even though she had received scores ranging from 6 to 8 (i.e., "satisfactory" to "superior") on the same rotation for the May 31st to June 30th period (the "June VA rotation"). Dr. Etzkorn was one of the plaintiff's evaluators for both rotations.

32.     Upon information and belief, plaintiff's performance did not decline between the June and October VA rotations. Upon information and belief, the reason for plaintiff's lower score in October 15 that supervisory staff for the defendant assumed that plaintiff's ability to perform the functions of her position was impaired due to the recent birth of plaintiff's child and her new family responsibilities.

33.     On or about November 15, 1996, plaintiff had a meeting with Dr. Rosenberger (the "November 1996 meeting") concerning her allegedly inadequate performance as a medical resident and her chances for promotion to the second year of her residency, referred to by the designation "PGY-2."

34.     At the November 1996 meeting, Dr. Rosenberger informed plaintiff that in his view, she was not doing well in the residency program due to her "circumstances." Upon information and belief, Dr. Rosenberger meant by the term "circumstances" the recent birth of her child.

35.     At the November 1996 meeting, Dr. Rosenberger informed plaintiff that she was required to repeat three months of her residency for a "remediation" period, allegedly because of her inadequate performance. Plaintiff alleged that several of her evaluations were grossly inadequate and unfair in regard to the substantive comments and the process, and asked Dr. Rosenberger to investigate.

36.     On occasions other than the November 1996 meeting, plaintiff asked other supervisory and management personnel other than Dr. Rosenberger to investigate her allegations of inadequate and unfair evaluations.

8

37.     On or about December 2, 1996, plaintiff received a negative evaluation for the intensive

care unit (ICU) rotation covering the November 1996 period (the "November 1996 ICU

evaluation"). The evaluation included the following statement, in pertinent part:

> I will preface my remarks by noting that rotations for interns in the ICUs are
> always difficult. The challenge of ICU work is usually met through
> determination, hard work and long hours. All three interns on rotation this month
> were distracted from patient care by personal issues. Because all of the rotators
> were unable to fully commit themselves to the intensive care unit they were
> unable to provide a level of care commensurate with their level of training and
> clinical abilities.... The ... significant problem common to all the rotators was an
> inability or unwillingness to make a greater time commitment... To their credit,
> performance improved by the end of the month to an acceptable level. Greater
> improvement might have been achieved if all three housestaff assigned to the unit
> did not uniformly refuse to make a greater time commitment to their own learning
> and to patient care. My "overall clinical competence" scores are rounded down in
> order to reflect my rotators [sic] unwillingness to make a total commitment to
> their intensive care unit responsibilities. [emphasis added]

38.     During the November 1996 ICU rotation, plaintiff was a breastfeeding mother who from

time-to-time had to take breaks to express milk during work.  If plaintiff went more than one or

two hours to express her milk, she would experience extreme breast pain.

39.     One of the other residents referred in the evaluation quoted in paragraph 37 also was a

lactating mother who expressed milk during work. Upon information and belief, one of the

major "personal issues" referred to in the evaluation was the need of plaintiff and the other

lactating mother to express breast milk during breaks from work.

40.     Plaintiff demonstrated a full commitment to her responsibilities as an ICU unit resident,

put in comparable hours to other interns in such unit who did not need to express milk, and

performed her responsibilities in a satisfactory fashion.  Upon information and belief, residents

who took breaks of similar frequency and duration during the ICU unit as those of the plaintiff

9

did not receive negative evaluations as a result. Upon information and belief, the scores on plaintiff's November 1996 ICU evaluation and her evaluation for October VA rotation were influenced by the belief of supervisors that female medical residents, and breastfeeding mothers in particular, were not able to perform at the same level as residents not similarly situated.

41.     On or about December 18, 1996, plaintiff met concerning her future plans with Dr. Rosenberger (the "December 1996 meeting").    At the meeting, Dr. Rosenberger and plaintiff reviewed plaintiff's allegedly unsatisfactory performance in the first year of her residency. Plaintiff contended that several of her evaluations were false and based on personal malice towards her. Moreover, plaintiff asked Dr. Rosenberger to investigate such evaluations, which he refused.

42.     During the December 1996 meeting, Dr. Rosenberger reiterated his previous statement, made originally during the November 1996 meeting, that plaintiff would need to complete a three-month remediation to return to the program and to be promoted to the second year of her residency.

43.     During the December 1996 meeting, plaintiff then requested leave in order to take care of plaintiff's young child. Dr. Rosenberger granted plaintiff's leave request, and restated that plaintiff would be required to complete a three-month remediation after returning to the program following the taking of family leave. Dr. Rosenberger stated that plaintiff would be reinstated in the program when she returned from family leave, providing that she engaged in remediation. Plaintiff relied upon Dr. Rosenberger's promise to reinstate her into the program upon her return from family leave.

44.     During the December 1996 meeting, plaintiff also requested that she be permitted to complete the medical rotations necessary to complete the first year of her medical residency, prior to going on family leave. Dr. Rosenberger agreed that she could complete these rotations.

45.     In December of 1996 and January of 1997, plaintiff successfully completed the two rotations necessary to complete the first year of her medical residency – "Night Float" and Emergency Room – prior to ending her term of employment on February 2, 1997.

46.     Plaintiff received grades ranging from 6 to 8 on a 9 point scale for the December 1996 night float rotation. Under defendants' grading system, a grade of 4-6 connotes "satisfactory" performance, and a grade of 7-9 connotes "superior" performance. The evaluator commented that "Syeda did a good job on a difficult rotation." In the January 1997 emergency room rotation, plaintiff received grades of 5 ("satisfactory") for all 9 items rated, except for a single 4 (also a "satisfactory" rating).

47.     In a recommendation letter dated January 12, 1998, distributed to residency programs throughout the nation in conjunction with plaintiff's applications to such programs, Paul J. Davis, M.D., the Chairman of Albany Medical College's Department of Medicine, stated that plaintiff had "concluded her PGY1 with an entirely satisfactory performance in our very busy Emergency Department" and that plaintiff "by the end of the year was clearly a sound house officer." Dr. Davis further stated that plaintiff by the end of the year had "resolved" certain "compelling personal issues that were understandably beyond her control." Upon information and belief, by "compelling personal issues," Dr. Davis meant pregnancy and child care issues.

48.     Shortly after the December 1996 meeting, Dr. Rosenberger called plaintiff and asked her to resign from the program, which she refused. During this telephone call, Dr. Rosenberger promised to provide plaintiff with a certificate of completion indicating that plaintiff had completed the first year of her residency program.

49.     Plaintiff has not received the promised certificate of completion to date after repeated requests.

11

50.     In March of 1997, plaintiff spoke to Ms. Worgan about plaintiff's intention to return to the program after taking family leave for a few weeks. Ms. Worgan asked plaintiff to inform the defendants at the point plaintiff was certain as to when she intended to return to the program.

51.     In August of 1997, plaintiff called Ms. Worgan, and told her that she was now ready to return to the program from family leave. During that telephone conversation, Ms. Worgan told plaintiff for the first time that she would have to reapply to the program to be reinstated, with no guarantee of reinstatement.

52.     On or about September 12, 1997, plaintiff spoke by telephone to Alwin F. Steinmann, M.D., then Program Director of the AMC Internal Medicine Residency Program ("Dr. Steinmann") following Dr. Rosenberger's resignation. Plaintiff indicated that she now wished to return to the program, and that there had been an understanding that she could return after her family leave. Dr. Steinmann replied that while the Department might consider reinstating her after a three-month probationary period as a PGY-1 (i.e., a first-year resident), she could not be reinstated at the present time because there was no open salary line for such a position. Plaintiff even offered to work without compensation if she were reinstated, since she needed the training, but Dr. Steinmann nevertheless refused to reinstate her.

53.     By a letter dated October 15, 1997, plaintiff wrote Dr. Steinmann to request a PGY-1 or PGY-2 position as soon as it became available.

54.     In letters dated April 30, 1998, and April 22, 1998, Dr. Steinmann informed the plaintiff that: (1) there were presently no open positions for either preliminary or categorical residents in the Internal Medicine Residency Program; (2) that she had never been promised reinstatement without the need to reapply; and that (3) once positions were open, plaintiff would have to apply along with other residency candidates. In his April 30, 1998 letter, Dr. Steinmann further stated that "I consider this matter closed and have no further comments."

12

55. Dr. Steinmann's statements in his April 30, 1998 and April 22, 1998 letters were false in that plaintiff was in fact promised reentry into the program without reapplication after taking family leave.

56. Upon information and belief, other residents allegedly experiencing academic or personal difficulties, but who were not pregnant or disabled by pregnancy, childbirth or related medical conditions were permitted to engage in remediation rather than terminated, as was the plaintiff. Upon information and belief, other residents who took leave for reasons other than pregnancy, childbirth and related medical conditions, including those with alleged academic difficulties, were not terminated as a result.

AS AND FOR A
FIRST CLAIM FOR RELIEF
(Family and Medical Leave Act)

57. Plaintiff repeats and realleges each and every allegation contained in Paragraphs 1 through 56 with the same force and effect as if set forth in full herein.

58. Plaintiff is an "eligible employee" and each defendant is an "employer" pursuant to FMLA.

59. During her December 1996 meeting with Dr. Rosenberger, plaintiff requested leave to care for her daughter Amber pursuant to FMLA.

60. Plaintiff provided thirty days notice prior to her leave, as is required under 29 U.S.C. § 2612, unless the date of the birth requires leave to begin in less than thirty days.

61. Despite plaintiff's repeated requests, defendants failed to restore plaintiff to the position of employment she held when her leave commenced, or to restore her to an equivalent position

13

with equivalent employment benefits, pay, and other terms and conditions of employment, in violation of 29 U.S.C. § 2614.

62.     Alternatively, during their November 1996 and December 1996 meetings, Dr. Rosenberger told plaintiff that if she took leave to care for her newborn daughter, plaintiff would have to reapply for reinstatement as a medical resident with no guarantee of continued employment. Insofar as defendants conditioned plaintiff's guaranteed reinstatement on not taking family leave, defendants interfered with, restrained or denied the exercise of plaintiff's right to take family leave in violation of 29 U.S.C. §§ 2612 and 2615(a)(1).

63.     As a proximate result of the failure by defendants to restore plaintiff to the same or equivalent position as when her leave commenced and plaintiff's exercise of her rights under FMLA, plaintiff suffered and continues to suffer substantial losses, including the loss of past and future earnings, deferred compensation, and other employment benefits.

64.     As a further proximate result of defendants' actions, plaintiff has suffered and continues to suffer impairment and damage to plaintiff's good name and reputation.

65.     As a further proximate result of defendants' actions, plaintiff has suffered and continues to suffer severe and lasting embarrassment, humiliation and anguish, and other incidental and consequential damages and expenses.

AS AND FOR A
SECOND CLAIM FOR RELIEF
(Title VII; Pregnancy Discrimination Act)

66.     Plaintiff repeats and realleges each and every allegation contained in Paragraphs 1 through 56 and 58 to 65 with the same force and effect as if set forth in full herein.

67.     Defendants have discriminated against plaintiff because of her gender and her pregnancy,

14

childbirth, and/or related medical conditions by refusing to extend or renew plaintiff's house staff contract, terminating plaintiff as a medical resident and refusing to rehire her as a medical resident. Defendants have also discriminated against plaintiff in regard to other terms and conditions of employment such as job assignments and evaluations. Defendants have thereby intentionally engaged in unlawful employment practices prohibited by 42 U.S.C. § 2000e-2(a).

68.     Plaintiff has been unable, despite reasonable efforts, to find other residency positions.

69.     As a proximate result of defendants' discrimination against plaintiff on the basis of her gender and her pregnancy, childbirth and/or related medical conditions, plaintiff has suffered and continues to suffer substantial losses, including the loss of past and future earnings, deferred compensation, and other employment benefits.

70.     As a further proximate result of defendants' actions, plaintiff has suffered and continues to suffer impairment and damage to plaintiff's good name and reputation.

71.     As a further proximate result of defendants' actions, plaintiff has suffered and continues to suffer severe and lasting embarrassment, humiliation and anguish, and other incidental and consequential damages and expenses.

72.     The conduct of defendants was outrageous and malicious, was intended to injure plaintiff, and was done with reckless indifference to plaintiff's protected civil rights, entitling plaintiff to an award of punitive damages.

AS AND FOR A
THIRD CLAIM FOR RELIEF
(Americans With Disabilities Act)

73.     Plaintiff repeats and realleges each and every allegation contained in Paragraphs 1 through 56, 58 to 65 and 67 to 72 with the same force and effect as if set forth in full herein.

15

74.     Defendants discriminated against plaintiff because of her disability (pregnancy, childbirth and related conditions) by refusing to extend or renew plaintiff's house staff contract, terminating plaintiff as a medical resident, refusing to rehire her as a medical resident.  Defendants have also discriminated against plaintiff in regard to other terms and conditions of employment such as job assignments and evaluations.

75.     Plaintiff is a "qualified individual with a disability" under 42 U.S.C. §§ 12102 and 12111(8) in that she is able to perform the essential functions of the residency position she held and desires to continue, with or without reasonable accommodation.  Plaintiff had a "disability" under  42 U.S.C. §§ 12102 in that either she "had a physical ... impairment that substantially limit[ed] one or more of ... [her] major life activities" and/or was "regarded [by the defendant] as having such an impairment."

76.     Plaintiff has been unable, despite reasonable efforts, to find other residency positions.

77.     As a proximate result of defendants' discrimination against plaintiff on the basis of her disability and/or the perception of her disability, plaintiff has suffered and continues to suffer substantial losses, including the loss of past and future earnings, deferred compensation, and other employment benefits.

78.     As a further proximate result of defendants' actions, plaintiff has suffered and continues to suffer impairment and damage to plaintiff's good name and reputation.

79.     As a further proximate result of defendants' actions, plaintiff has suffered and continues to suffer severe and lasting embarrassment, humiliation and anguish, and other incidental and consequential damages and expenses.

80.    The conduct of defendants was outrageous and malicious, was intended to injure plaintiff, and was done with reckless indifference to plaintiff's protected civil rights, entitling plaintiff to an award of punitive damages.

AS AND FOR A
FOURTH CLAIM FOR RELIEF
(New York Human Rights Law)

81.    Plaintiff repeats and realleges each and every allegation contained in Paragraphs 1 through 56, 58 to 65, 67 to 72 and 74 to 80 with the same force and effect as if set forth in full herein.

82.    The defendants' disparate treatment of plaintiff, including their refusal to extend or renew plaintiff's house staff contract, termination of plaintiff as a medical resident, and refusal to rehire her as a medical resident on the basis of her sex and/or disability (pregnancy, childbirth or related medical conditions) and its disparate treatment in regard to other terms and conditions of employment (such as job assignments and evaluations) was in violation of the New York Human Rights Law.

83.    Plaintiff has been unable, despite reasonable efforts, to find other residency positions.

84.    As a result of the foregoing, plaintiff has been denied employment, has lost wages, benefits, and promotional opportunities, has suffered mental anguish, emotional distress and loss of enjoyment of life, and has incurred damages thereby.

AS AND FOR A
FIFTH CLAIM FOR RELIEF
(Breach of Contract)

85.    Plaintiff repeats and realleges each and every allegation contained in Paragraphs 1 through 56, 58 to 65, 67 to 72, 74 to 80 and 82 to 84 with the same force and effect as if set forth in full herein.

17

86.     The defendants': (1) refusal to extend or renew plaintiff's house staff contract; (2) termination of plaintiff as a medical resident; (3) refusal to rehire plaintiff as a medical resident; (4) failure to provide her with a certificate of completion for the first year of her residency; and (5) discrimination in regard to other terms and conditions of employment (such as job assignments and evaluations) each constitute a breach of plaintiff's contract of employment.

87.     As a result of these breaches of contract, the defendants have damaged plaintiff in the manner set forth in paragraphs 77 through 79 above which is incorporated herein by reference. Plaintiff is therefore entitled to recover these damages from the defendants under the common law of New York.

AS AND FOR A
SIXTH CLAIM FOR RELIEF
(Promissory Estoppel)

88.     Plaintiff repeats and realleges each and every allegation contained in Paragraphs 1 through 56, 58 to 65, 67 to 72, 74 to 80, 82 to 84 and 86 to 87 with the same force and effect as if set forth in full herein.

89.     Plaintiff reasonably relied to her detriment upon the promises made to her prior to and during her position with the defendants concerning the terms and conditions of her employment and upon the promises made in her contract of employment.  Plaintiff believed at all times prior to August of 1997 that she was a categorical resident, and thus entitled to employment for a three-year period; and that she would be reinstated to her residency after taking family leave without reapplying to the program, upon completing a three-month remedial program.

90.     By refusing to extend or renew plaintiff's house staff contract, terminating plaintiff as a medical resident and refusing to rehire plaintiff as a medical resident, the defendants breached the foregoing representations, promises and inducements, which it is estopped to deny because of plaintiff's reliance on them.  Plaintiff's reliance on defendants' representations, promises or

18

inducements that she was a categorical resident was to plaintiff's detriment in that absent such representations, promises or inducements, she would have applied in 1996 for second and third-year residency programs at other schools.  Plaintiff's reliance on defendants' representations, promises or inducements that she would be reinstated to her residency after taking family leave without reapplying was similarly to plaintiff's detriment, in that had she known she had to reapply, she would not have taken family leave.

91.    The defendants have damaged plaintiff in the manner set forth in paragraph 77 through 79 above which is incorporated herein by reference, and plaintiff is entitled to recover such damages as a result of the foregoing breaches of promise.

WHEREFORE, plaintiff respectfully requests that this Court enter judgment in favor of plaintiff and against defendants as follows:

(a) on the First Claim for Relief:

(i) an award of plaintiff's actual damages in an amount not less than TWO HUNDRED THOUSAND DOLLARS ($200,000) for loss of wages, benefits, and promotional opportunities, including an award of front pay compensating plaintiff for loss of future salary and benefits;

(ii) an order enjoining defendants from engaging in the wrongful practices alleged herein and/or reinstating plaintiff to her position; and

(iii) an award of reasonable attorneys' fees and the cost of this action;

(b) on the Second and Third Claims for Relief:

(i) an award of plaintiff's actual damages in an amount not less than TWO HUNDRED THOUSAND DOLLARS ($200,000) for loss of wages, benefits, and promotional opportunities, including an award of front pay compensating plaintiff for loss of future salary and benefits;

(ii) an award of damages in an amount not less than ONE HUNDRED THOUSAND DOLLARS ($100,000) to compensate plaintiff for mental anguish, humiliation, embarrassment, and emotional injury;

(iii) an award of punitive damages;

(iv) an order enjoining defendants from engaging in the wrongful practices alleged herein; and

(v) an award of reasonable attorneys' fees and the costs of this action;

(c) on the Fourth Claim for Relief:

(i) an order that defendants restore plaintiff to her former position with full seniority, status, salary increments, bonuses and benefits, to the extent the she would have received but for defendants' unlawful conduct;

(ii) an order prohibiting defendants from continuing or maintaining the policy, practice and/or custom of denying job benefits to employees on the basis of sex and/or disability;

(iii) an award to plaintiff of her actual damages in an amount not less than TWO HUNDRED THOUSAND DOLLARS ($200,000) for loss of wages, benefits, and promotional opportunities, including an award of front pay compensating plaintiff for loss of future salary and benefits;

(iv) an award to plaintiff of compensatory damages in an amount not less than ONE HUNDRED THOUSAND DOLLARS ($100,000) for humiliation, mental anguish and emotional distress sustained by her;

(v) a declaration that defendants' actions were in violation of NYSHRL; and

(vi) an award to plaintiff of the costs of this action, together with reasonable attorneys' fees to the fullest extent permitted by law;

(d) on the Fifth and Sixth Claims for Relief:

(i) an award of damages in an amount to be determined by the Court; and

(e) such other and further relief as this Court deems just and proper.

20

DATED:   February 19, 1999
             Nassau, New York

                                  LAW OFFICE OF BOB COHEN

By: _____
                      BOB COHEN
                  (Bar Roll No. 509663)
                  434 McClellan Road
                  Nassau, NY 12123
                  (518) 766-7430

                  Attorney for Plaintiff

21